SCHOTT, Judge.
This case arose out of an accident on March 5, 1979 between a bus owned by New Orleans, Public Service, Inc. (NOPSI) and driven by its employee, Willie Bell, and an automobile owned by Star Chrysler Company (Star), driven by Keith Rush, and insured by Allstate Insurance Company. Plaintiff was a passenger on the bus and was injured in the accident. After trial by jury a verdict of $338,000 was returned against NOPSI and Bell and Rush, Star, and Allstate, jointly and in solido. All defendants have appealed contesting liability and quantum. The issues on appeal are: whether the jury erred manifestly in finding both Bell and Rush to have been negligent and in finding that plaintiffs permanent back injury was caused by the accident; and whether the jury abused its much discretion in the amount of the award for loss of earning capacity and general damages.
The accident occurred on the morning of March 5, 1979 at the intersection of Canal and South Robertson Streets in New Orleans. At this point Canal Street is a wide thoroughfare containing four traffic lanes on each side of a neutral ground area. In the middle of this area are two traffic lanes which are for the use of NOPSI busses. Prior to the accident Bell was driving his bus in the river-bound lane in the neutral ground and Rush was proceeding on Canal toward the river in the lane adjacent to the neutral ground. When Bell reached South Robertson Street he stopped to discharge passengers and was confronted with a white automobile in the process of crossing Canal from Bell's left but now stopped in Bell’s lane waiting for river bound traffic on Canal to clear so it could continue across. Rush intended to make a left turn on South Robertson across the neutral ground and its bus lanes. Bell proceeded into the oncoming neutral ground bus lane to go around the stopped white car and just as his bus passed the rear of this car the right front wheel of the bus was struck by Rush’s left turning automobile.
LIABILITY OF NOPSI AND BELL
NOPSI argues that the trial judge erred in failing to submit to the jury a number of instructions it requested concerning the duties encumbent on a left turning motorist such as Rush. Although the trial judge did include in his general charge a discussion of these duties, NOPSI complains that this general charge was “watered down” and “did not emphasize” the left turning driver’s duties. The charge given was as follows:
“Now, the duty of a left-turning motorist. A left turning motorist must exercise a high degree of care. It must make certain that his turn can be made in reasonable safety. The duty of a motorist who attempts a left turn is two-fold. First, he must give a signal indicating his intent to turn. Second, he must check the rear immediately before the turn is attempted to ascertain whether the turn can be made safely without endangering normal passing or oncoming traffic. When an accident occurs the burden rests on the left-turning motorist to show his freedom from negligence....”
We are satisfied that this is a fair and adequate instruction and no error was committed when the trial court rejected those requested by NOPSI.
As a common carrier NOPSI was charged with the highest degree of care to plaintiff, its passenger; and the slightest *1237 negligence causing injury to its passenger will result in liability. Once plaintiff established that she was injured the burden was on NOPSI to show it was free from negligence. Galland v. New Orleans Public Service, Inc., 377 So.2d 84 (La.1979).
We cannot conclude that NOPSI carried this heavy burden of proof. According to Bell, the white car was just partially obstructing his lane of traffic and as he began to go around this car’s rear he saw Rush’s automobile, with left turn indicators working, make a left turn into the intersection at a rapid rate of speed. Bell then cut to the left to avoid the impending accident but to no avail. However, the jury apparently believed that Bell had to be inattentive or traveling too fast under these congested circumstances or both, and that this constituted negligence. There was testimony from a passenger who had been discharged at South Robertson that Bell sped off into the oncoming lane around the white car. The record supports the jury’s ultimate conclusion that Bell was not free from fault.
LIABILITY OF RUSH, STAR, AND ALLSTATE
The primary contention of these defendants on liability is that the jury verdict was tainted because of the trial judge’s failure to instruct the jury as to the prohibition of LSA-R.S. 32:76 against a vehicle being driven to the left side of a highway within one hundred feet of an intersection. In declining to give this requested instruction the trial judge stated:
“The bus is in a protected alley reserved for buses. It’s not passing a car on a roadway or highway. It’s passing in a protected zone, and has greater rights than a left-turning motorist, and it’s not illegal for a bus to cross over an intersecting street.”
While there may be merit to this position that this roadway specially constructed along the neutral ground for bus-ses afforded them some special right-of-way privilege over other vehicles which must cross over the bus lanes, we do not hold in this case that R.S. 32:76 can never apply to busses using these lanes. One purpose of the statute seems to be for the protection of a motorist or pedestrian against his failure to see if a bus is approaching in the wrong lane. In other words, a person crossing the lanes is under a duty to see if a bus is approaching from the proper direction but not necessarily from the opposite direction. Regardless of these considerations, however, the evidence in the present case established that Rush simply failed to exercise precautions clearly warranted by the circumstances and failed to see what he should have seen.
He testified that he saw the bus moving alongside of his car and saw the white car obstructing the bus. He reasoned that the white car was blocking the bus, but his own car approaching the intersection was preventing the white car from moving. So he decided to proceed with his turn in order to permit the other vehicles to proceed. He characterized his speed as he made the left turn as “hardly moving”.' Yet, he ran his automobile into the front wheel of the bus. There is no manifest error in the jury’s obvious conclusion that Rush was negligent in failing to see a bus moving in his direction until he struck it. His argument that he was without fault would be much more persuasive had the bus struck his car or even had his car struck the very front of the bus.
In addition, the circumstances prevailing when Rush made his turn required him to exercise some care beyond that which he exercised. Here was a bus blocked by a car which in turn was waiting for traffic on Canal Street to clear. Rush should have considered the possibility that the bus driver might pass this car in order to accommodate passengers on their way to work and to keep on schedule. Rush, in effect, was on notice that the bus might have to go around the car and he should have looked out for this possibility. If the jury found his failure to take this precaution constituted negligence no manifest error was committed. We have concluded that the trial *1238 court properly found Rush, Star and Allstate liable jointly with Bell and NOPSI.
QUANTUM
As the jury returned a lump sum verdict we can only speculate as to how they arrived at the sum of $338,000. If they accepted plaintiffs best evidence as to lost earnings and included special medical expenses they must have awarded her about $135,000 in general damages.
There is no question that by January, 1980 plaintiff had a ruptured interver-tebral disc at L5-S1, and the evidence establishes that this condition has caused plaintiff to be permanently disabled and to have suffered a great deal of pain. It is equally clear that if the jury committed manifest error in finding the accident was the cause of the ruptured disc, the award was grossly excessive and constituted an abuse of the jury’s discretion. Therefore, the central issue is whether or not the accident caused the ruptured disc.
Plaintiff was standing on the bus when the accident happened. The impact caused her to fall on her back and other passengers fell on her. She continued on to work but left to see Dr. Anthony J. Hackett, a general practitioner, on the suggestion of her boss. She told Dr. Hackett she had pain in the shoulders, arms, back, hips, and thighs. He prescribed heat, medication, and physiotherapy. On April 26, 1979 he discharged her, and she complained of pain only in the left knee. Plaintiff testified that from April to December, 1979 she was seen by “Corner Doctors” but none of these testified.
On December 21, 1979 plaintiff went to Dr. Lamar Puryear, a general practitioner in Mississippi, complaining of a sore leg, nausea, and nervousness. She made no mention of her back and his examination of her elicited no complaint about her back. He saw her again on December 26 and there was no complaint about or evidence of back problems. While he admitted the possibility that her leg pain could have been related to a back problem, he did not think so and thought she had tendonitis in the leg.
On January 4, 1980 plaintiff went to Dr. John J. Watermeier, an orthopedist. She told him she was doing well until the March, 1979 accident but since then had stiffness, locking and a “give-way” sensation of the left knee, numbness in the toes of her left foot, and lower back pain. Examination revealed a slight limp favoring her left leg, mild degree of spasm in her lower back, pain on straight leg raising indicating nerve irritation in her back, tenderness in the knee, and decreased sensation in her foot. This examination led Dr. Watermeier to have a myogram done on January 29 which was positive for nerve damage or nerve irritation from her lower back at L5-S1. In April a myelogram and a discogram revealed an abnormality of the lower back at L4 level and bulging discs at L4-L5 and L5-S1.
At the time of the accident plaintiff was employed as a cook at a small neighborhood restaurant in New Orleans. She missed three weeks of work right after the accident and two weeks when she was under Dr. Puryear’s care in Mississippi, but otherwise she worked continuously with some occasional days off until she quit her job in March, 1983, about two months before the case went to trial. Dr. Watermeier as well as Dr. Soboloff, an orthopedist, and Dr. Applebaum, a neurosurgeon, both of whom saw her later on, all testified that one can rupture a disc when tying a shoe lace, coughing, or even vomiting. And there is an indication that she had a vomiting spell in December 1979.
Thus, the jury was confronted with this curiosity of a person who sees one physician on December 26, 1979 and has no back problem but who is found by an orthopedist on January' 4, 1980 to have symptoms of a ruptured lumbar disc. Adding to the doubt about the accident being the cause of the back problem is Dr. Hackett’s discharge of her with no back problem six weeks after the accident and her working continuously. Her boss said she complained about her knee during this period.
*1239 On the other hand, plaintiff testified that she hurt her back in the accident, and she denied that she did it vomiting in December or tying her shoe laces. She did initially complain to Dr. Hackett about her back and his discharge summary listed contusion of the lower back among his initial findings. He testified that there was a neurosurgeon in the clinic where he worked and he would have referred plaintiff to him if he had suspected a serious back problem. However, on examination by plaintiffs counsel Dr. Hackett was told about the subsequent diagnosis and treatment for ruptured disc and was asked:
“Now, having this kind of hindsight knowledge of a ruptured disc, is it your opinion that Elaine had a ruptured disc at the time you were seeing her?”
Dr. Hackett replied: “It’s quite probable.”
Dr. Watermeier answered affirmatively a question whether the continuing knee problem plaintiff had in 1979 could have been the result of pain innervating down from the back. Finally, Dr. Applebaum was asked a hypothetical by the judge as to whether based on reasonable medical certainty he would relate the disc to the accident or to some vague, spontaneous incident like tying shoe laces. He replied:
“Well, according to her history it is. She relates her symptoms back to the time of the accident.”
As we interpret this answer, if one believes the plaintiff, one would find causation — which is exactly what the jury did. In addition to these considerations supporting the verdict there is the fact that plaintiff was found, on testing, to be a borderline mentally defective person. Undoubtedly this handicapped her ability to communicate her specific problems to the doctors and others. Furthermore, her mental condition does not seem to support the probability that she had a back injury between December 26,1979 and January 4,1980 and was able to conceal this from everyone successfully and place the blame for this problem on the accident sued on. In conclusion, while plaintiffs evidence of causation is sparse and even suspicious we cannot say from a careful review of the entire record that the jury was clearly wrong in finding it more probable than not that plaintiffs back injury was caused by the accident.
Unfortunately, plaintiffs problem does not end here because her evidence of earnings is questionable even with the proven back injury. As a starting point the only definite amount necessarily included in the $338,000 verdict was $5,237 for special medicals stipulated to by the parties:
Dr. H.R. Soboloff first saw plaintiff in February 1982 and ultimately confirmed the ruptured disc at L5-S1. Three alternatives for treatment would be surgery, chemical injection, and nerve blocks. The first two involve risks and plaintiff declined both. Nerve blocks do not necessarily provide permanent relief but may require repeat treatments. Surgery would cost about $6,000 and would still leave her ten to fifteen per cent disabled. Without the surgery she will be disabled to the same extent and will require drugs for pain and inflamation on an indefinite basis at a cost of twelve to fifteen hundred dollars a year. She can sit for three hours at a time with an hour or two break in between, she cannot engage in lifting, repetitive bending, stooping, carrying, or a lot of walking, and she can lift only up to twenty five pounds. Her work day should not be more than four or five hours without a rest, six hours with a rest, and alternating sitting and standing.
Plaintiff was thirty-four years of age at the time of trial. We can only speculate how much the jury awarded for her pain and suffering and disability, but we may assume that they awarded her $140,000 for this item. This would be generous, though not abusive of the jury’s discretion, and would leave about $192,000 for the economic items sought by plaintiff.
She called Dr. Melville Wolfson, an economist who calculated that except for the accident plaintiff would have been capable of earning the minimum wage for forty hours per week. Thus, he subtracted from this figure the amount she actually earned between the accident and the date of the *1240 trial to produce $11,659 of lost past earnings. He further calculated loss of future earnings at $146,665 using work life expectancy of twenty-seven years, minimum wage for eight hours per day, and a 7V2 per cent discount. He next calculated her loss of meals to be $15,785 and six hundred dollars per year for medicine to be worth $17,864 with both sums also based on a discount of 7V2 per cent. These items total $191,973.
The first problem with this approach is that it would compensate plaintiff far in excess of what she ever earned before the accident. The minimum wage for forty hours per week used by Wolfson would produce an annual salary of $6,960. Yet plaintiff earned only $3,052 in 1979 (the year of the March accident), $2,432 in 1978, $959 in 1977, $476 in 1976, $231 in 1975, $3,064 in 1974, $3,347 in 1973, $3,088 in 1972, and $3,038 in 1971. The evidence established that plaintiff was extremely limited in what she could do even before the accident because of her mental condition. However, she began working for Mais Oui Restaurant in 1978, and her boss described her as a dependable, sincere and honest employee. For the first six months on the job she worked seven hours a day and for the next nine months until the accident she was cut to five hours a day because of declining business. When plaintiff’s earning history is considered, it cannot be said that plaintiff more probably than not would have consistently worked forty hours per week for her working life even if she had not been injured. If the jury accepted Wolfson’s projections on this basis they were clearly wrong.
There is no conflict between this conclusion and the court’s decision in Folse v. Fakouri, 371 So.2d 1120 (La.1979). There the court held that what plaintiff earned before and after the injury does not constitute the measure of plaintiff’s ability to earn money, but here we consider a special plaintiff who was severely limited in her earning capacity before the accident. Evidence of her meager earnings for eight years preceding the accident surely demonstrates that this mentally defective plaintiff would probably never work full time even without the occurrence of the accident. In Folse the court held that earning capacity at the time of the injury is relevant although not determinative of plaintiff’s future ability to earn. However, plaintiff cannot expect to be compensated on a basis of earnings which were beyond her ability in the first instance.
Next, a serious question was raised over Wolfson’s use of twenty-seven years of work-life expectancy. Defendants produced an economist, Stuart Wood, who testified that the accurate figure for plaintiff’s work life expectancy was but seventeen years. He explained that Wolfson’s figure was a theoretical one based on age alone whereas his was based on the actual number of years a female could be realistically expected to work considering that she will probably be out of the job market for some significant periods of time during her work life span. While the jury was not obliged to accept Wood’s seventeen years as the probable work life expectancy it seems clear that it was manifest error for them to disregard totally the probability that she would have been out of the job market for at least some of the twenty-seven years even without the accident.
Wolfson took no account of the possibility that plaintiff may earn something even with her accident caused disability. In this connection we do not question the jury’s apparent indifference to the fact that plaintiff earned $4,165 in 1980 and $4,224 in 1981, more than she had ever earned in her life even in her disabled condition. From the testimony of her boss the jury could have concluded that plaintiff was simply being carried — allowed to reduce her output, to rest and even to lay down at will while on the job. The boss further testified that plaintiff was working in pain and constantly complaining, but she kept plaintiff on until she quit. It seems clear that her 1980 and 1981 earnings were not realistic examples of what she can probably expect to earn in the future.
*1241 However, Thomas Meunier, a vocational rehabilitation specialist, testified without equivocation that with all plaintiff’s limitations, mental as well as physical, described by Dr. Soboloff, he could place plaintiff in some sort of gainful employment such as a “silver wrapper” in a restaurant or counter attendant in a lunch room. For the most part this testimony was countered by that of Terrence Kennedy, a vocational rehabilitation counselor, who stated that it would be difficult to place plaintiff in any job within her mental and physical capability, and if she could be placed she could not keep the job because of her physical limitations. We are unable to conclude that the jury was clearly wrong in finding that plaintiff is totally disabled as for as gainful employment is concerned.
Having concluded that the jury was manifestly erroneous in concluding plaintiff should be compensated for loss of future earnings on the basis of working eight hours per day for a full twenty-seven years, we thus conclude that the award of $338,000 constituted an abuse of the jury’s discretion and some adjustment is warranted. In his testimony Dr. Wolfson provided the amount needed to compensate plaintiff on the basis of a loss of five, rather than eight hours, over a twenty seven year period. This amounted to $56,768 instead of $146,665 and would more nearly approximate plaintiff’s loss. Even if she arguably might have worked six or seven days but for her injury the five day figure would take into account the error of assuming her work life expectancy of twenty seven years. Thus we reduce the award from $338,000 to $248,000 in order to correct the trial court’s abuse of discretion.
Accordingly, the judgment appealed from is amended to reduce the jury verdict to $248,000. In all other respects the judgment is affirmed. All costs including costs of this appeal are assessed against defendants.
AMENDED AND AFFIRMED.